IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TIMOTHY CAPPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 5:18-CV-133-FL[1] |
| | ) | WESTERN DIVISION |
| | ) | |
| MONTY HARRIS; NEWMARK & | ) | |
| COMPANY REAL ESTATE, INC.; | ) | |
| NEWMARK SOUTHERN REGION, | ) | |
| LLC; and DOES 1-25, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| GREGORY KATZ, | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 7:18-CV-47-FL |
| | ) | SOUTHERN DIVISION |
| TIMOTHY CAPPS, | ) | |
| | ) | |
| Defendant and Counter-Claimant, | ) | |
| | ) | |
| and KACIE HOPKINS VAN HINE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

---

[1]Although the parties stipulated to use a form of caption set forth in their joint report and plan, showing only case No. 5:18-CV-133-FL in this consolidated case, and the court adopted that stipulation in the case management order (see 5:18-CV-133-FL, DE 43 at 1 n. 1), the court retains herein the original case numbers in its caption in accordance with the court's standard caption format for consolidated cases. Case No. 5:18-CV-133-FL remains the lead case solely in which filings shall be made henceforth in this consolidated case, but the court uses the caption above for clarity of party designations. The court hereby AMENDS its case management order to reflect the caption above, and the parties shall use the caption above in their filings until further order by the court.

This consolidated matter is before the court on motion (DE 25) by Newmark & Company Real Estate, Inc.'s ("NRE") and Newmark Southern Region, LLC's ("Newmark Southern Region") (collectively "Newmark") to dismiss claims brought by Timothy Capps ("Capps") for failure to state a claim. In this posture, the issues raised are fully briefed and ripe for ruling. For the following reasons, Newmark's motion is granted in part and denied in part.

## STATEMENT OF THE CASE

This case concerns the failed business relationship between two real estate brokers. Gregory Katz ("Katz") and Capps initially worked together as two real estate brokers leading a team of other brokers to represent corporate tenants, pursuant to employment agreements with Newmark Southern Region, an affiliate of a large real estate company. Newmark recruited both Katz and Capps to come work for their company in hopes of obtaining more business from corporate tenants. Kacie Hopkins Van Hine ("Van Hine") was an executive assistant to Capps during his time working at Newmark, and Monty Harris ("Harris") was a real estate broker that was a part of Capps's and Katz's team during the events leading to the current actions. While the parties dispute the circumstances, it is clear that Katz and Capps eventually were no longer able to work together, and the resulting claims involve the parties attempting to deal with the unraveling of this relationship.

Integral to the dispute among the parties is the legal status of the relationship between Katz and Capps. Katz filed his complaint against Capps and Van Hine on December 22, 2017. After amending his complaint, Katz seeks a declaratory judgment against Capps that the team Katz and Capps led together at Newmark, which came to be known as the Critical Transactions Group ("CTG"), is not and was never a legal partnership with Capps. Katz also alleges misconduct on the part of Capps and Van Hine during the course of their prior dealings. Katz claims Capps defamed

him, and that both Capps and Van Hine committed torts against him to undermine his work with Newmark, including accessing a protected computer without authorization in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, invasion of privacy, conspiracy, negligence or wantonness, and engaging in unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1. Katz seeks compensatory damages, punitive damages, trebled damages, equitable relief, and costs against Capps and Van Hine.

While Katz's case was in the Northern District of Georgia, the parties filed cross-motions to transfer the case, with Katz seeking to transfer the case to the United States District Court for the Southern District of Florida, and Capps and Van Hine seeking to transfer the case to this court. (DE 6, 10). On March 22, 2018, the United States District Court for the Northern District of Georgia granted the motion transferring the case to this court and denied the motion to transfer the case to the Southern District of Florida. (DE 13). Katz subsequently amended his complaint on April 19, 2018.

On May 3, 2018, Capps and Van Hine responded to Katz's amended complaint, asserting that a partnership had been established between Capps and Katz, denying that Capps or Van Hine had engaged in misconduct, and asserting various affirmative defenses. In the meantime, together with his original answer to Katz's complaint on March 29, 2018, Capps also filed several counterclaims. In his counterclaims, Capps asserts Katz engaged in misconduct by forcing Capps out of a business partnership that the two had established as they worked together at Newmark. Capps sues Katz for breaching their alleged partnership under several theories such as breach of contract, breach of implied contract, promissory estoppel, and breach of fiduciary duty. Capps also alleges numerous causes of action in tort, including that Katz defamed him by asserting he was

causing problems among their team of brokers, and unlawfully deprived him of profits that he would have otherwise made by tortiously interfering with contracts and business opportunities between Capps, prospective corporate tenants or prospective corporate employers. Finally, Capps alleges Katz conspired with Harris and Newmark to deprive him of commissions he rightfully earned and the value of renegotiating his employment, and Katz engaged in unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1. Capps seeks damages, treble damages, attorneys fees, costs, and other relief.

Also on March 29, 2018, Capps commenced the first case captioned above, asserting claims based upon diversity jurisdiction against Newmark and Monty Harris ("Harris") for violation of his contractual rights arising from his work as a real estate broker for Newmark Southern Region. Capps asserts contractual claims against Newmark for allegedly breaching the terms of his broker agreement with the company by failing to pay him commissions, denying him the opportunity to arbitrate, and unlawfully terminating him with cause.[2] Capps also sues Newmark for allegedly interfering with business opportunities that he was entitled to receive, bringing causes of action for aiding and abetting breach of fiduciary duty, tortious interference with contract, tortious interference with business relations, defamation, and conspiracy. Capps also sues Newmark for unfair and deceptive trade practices, in violation of N.C. Gen. Stat. § 75-1.1. Capps seeks damages for lost commissions and lost opportunity to monetize his business by renegotiating the terms of his employment. He also seeks treble damages, attorney's fees, and costs.

Capps filed a motion on April 30, 2018, to consolidate case No. 5:18-CV-133-FL with case

---

[2]Capps also asserts two additional causes of action against Harris for breach of implied contract and promissory estoppel, which the court does not consider in the instant motion. Capps' complaint against Harris is grounded on the same grievances against Katz, namely breaking up the alleged partnership between Katz and Capps.

No. 7:18-CV-47-FL.

Newmark filed the instant motion to dismiss on May 14, 2018, raising multiple grounds for dismissal of the claims against them, as detailed further in the court's discussion herein. In support of the motion to dismiss, Newmark relies on a December 8, 2015 brokerage agreement between TMC General Brokerage, LLC, Capps, and Newmark Southern Region, LLC. ("2015 Broker Agreement") (DE 25-1). Newmark also relies upon the Newmark Grubb Knight Frank dispute resolution policy (DE 34-2), Capps's acknowledgement of the broker policy handbook (DE 34-3), and the broker handbook given to Capps (DE 34-4).

The court held combined telephonic status conference on May 30, 2018, and the next day entered an initial order regarding planning and scheduling that granted the motion to consolidate, allowed time for the parties to confer and submit to the court a joint report and plan for the consolidated cases, and directed Newmark to file a notice regarding representation of its counsel.

Upon joint report and plan filed by the parties, the court entered case management order on July 9, 2018, confirming that henceforth all filings henceforth shall be made only in the instant lead case number 5:18-CV-133-FL. The court set a deadline for all discovery to be completed by March 29, 2019. However, the court postponed certain depositions for a period of 90 days (now passed). The court also set a deadline for dispositive motions of April 30, 2019.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. In or about June 2014, Capps, Katz, and a team of associated real estate brokers were recruited by Newmark to work as independent contractors. (Compl. ¶ 20). Capps and Katz joined Newmark as partners with the intention of building a novel brokerage business, CTG. (Id. ¶ 22). Newmark internally and

externally welcomed their arrival to the firm, announcing the hiring of Capps, Katz, and their team. (Id. ¶¶ 23-24).

Katz introduced Capps to Katz's lawyer, who helped structure nearly identical seven-year independent contractor agreements with Newmark, commencing in January 2015 and expiring in January 2022.[3] (Id. ¶ 25; 2015 Broker Agreement (DE 25-1) ¶ 1). The agreements contained a resignation option which could be exercised in January 2019 only ("Resignation Option"), allowing Capps and Katz to renegotiate the terms of their employment with Newmark or other firms if their business performed well. (Compl. ¶ 25; 2015 Broker Agreement (DE 25-1) ¶ 3). At the time that Capps entered the 2015 Broker Agreement, he also executed a promissory note with an entity, BGC Notes, LLC, receiving a loan of $731,250 ("Note"), payable over the course of the 2015 Broker Agreement. (Id. ¶ 26).

CTG's line of business was to represent large corporate tenants in their real estate transactions, using investment and finance methods to structure them in a way that would be profitable for the client.[4] (Id. ¶¶ 27-28). Capps and Katz invested significant, time, energy, and capital into developing CTG and its approach to recruiting prospective clients. (Id. ¶ 30). From the time Capps and Katz officially joined Newmark in January 2015 through the end of 2016, CTG had grown into a significant revenue generator for Newmark, earning approximately $9,000,000 in total commissions and gaining credibility internally within Newmark and within the industry. (Id. ¶¶ 32).

---

[3]Since the 2015 Broker Agreement attached by NRE and Newmark Southern Region in support of their motion to dismiss is integral to the complaint, explicitly relied upon in the Complaint, and Capps does not challenge its authenticity, the court considers it in ruling on the motion to dismiss. Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 68 n.1 (4th Cir. 2016).

[4]Newmark's marketing materials state "[a]s a division of the only real estate firm in the world owned by a major investment bank, CTG uses its platform to identify, analyze, and structure exceptional outcomes from these arbitrage opportunities." (Compl. ¶ 28).

By early 2017, CTG had almost doubled in size, growing to include its own dedicated infrastructure to support the business. (Id. ¶ 31). CTG had become a unique revenue generating machine within and for Newmark, and also a leader in cross-selling services within the Newmark platform such as capital markets, investment sales, Global Corporate Services and project management. (Id. ¶ 33). By mid-2017, CTG had grown beyond expectations, and both Capps and Katz were optimistic about their ability to capitalize on their success and renegotiate the terms of their employment with Newmark or another company in January 2019. (Id. ¶ 39).

To incentivize teamwork, Capps, Katz, and other CTG brokers agreed to a unique compensation structure for CTG ("CTG Partnership"). (Id. ¶¶ 34-37). CTG provided all the necessary resources and support for brokers to source, pursue, and close big transactions with corporate clients. (Id.). In exchange, all brokers gave up a portion of their 60% share of commissions on all CTG transactions. (Id. ¶ 35). That portion would then be distributed as passive income to all brokers, regardless of their involvement in each transaction, with a fixed percentage assigned to each broker. (Id.). Capps and Katz each were to receive 30% of the commissions. (Id.). Harris expressly agreed to the terms of the CTG Partnership, both verbally and by his conduct, wherein he received a smaller percentage payment on deals irrespective of his role in working on or sourcing the deal. (Id. ¶ 38).

As CTG became more successful, Katz did not want to share the success of CTG with Capps, conspiring with Harris and others to alienate Capps from the CTG Partnership. (Id. ¶ 40). At a CTG quarterly summit on June 13 and 14, 2017, Katz claimed for the first time that Capps was the impediment to CTG's success, even through Capps and Katz had just attended a Newmark top producers meeting as a reward for their companywide success in sourcing deals. (Id. ¶¶ 41-42).

Capps was then boxed out of all CTG business that he was not directly involved in, though Katz and other CTG members continued to make capital investments and contractual commitments on his behalf. (Id. ¶ 45). After that meeting, CTG team members, acting at Katz's direction and including Harris, did not communicate or share information with Capps on deals not directly managed by Capps. (Id. ¶¶ 44-46). According to Capps, Katz also falsely told Harris and other CTG personnel that he could divert commissions due to Capps to them instead. (Id. ¶ 47).

On July 13, 2017, Capps and Harris were supposed to meet with a prospective client. (Id. ¶ 49). The night before and the morning of the meeting, Harris contacted Capps, stating that for various reasons he could not attend the meeting. (Id. ¶¶ 50-51). Capps attended the meeting without Harris, and found out that evening that Harris had missed the meeting because he had been drunk. (Id. ¶¶ 51-52). Since this was a problem that had previously occurred with Harris, Capps reached out to Katz to let him know what he had learned and discuss how to resolve the issue. (Id. ¶¶ 52-54). Katz became defensive of Harris, and refused to address Capps's concern. (Id. ¶¶ 55-56).

On August 1, 2017, Capps informed Katz of his intent to meet with Harris, emailed Harris to set up the meeting, and alerted Newmark Human Resources of the meeting. (Id. ¶ 57). Harris refused to meet with Capps. On August 2, 2017, Capps informed Harris that if they could not meet to address his concerns, then Capps would be forced to work directly with Newmark Human Resources. (Id. ¶ 59). On August 3, 2017, Katz told Capps that he intended to dissolve the CTG Partnership. (Id. ¶ 60). According to Capps, Katz continued to conduct CTG business without involving Capps, and continued to disseminate false and defamatory information about his disputes with Capps to members of the CTG team and other employees within Newmark. (Id. ¶ 62). According to Katz, from August 3, 2017 onward, regardless of how the client had been sourced and

developed to that point, Katz was entitled to the lion's share of commissions from those clients who he and others at CTG were primarily responsible for developing.  (Id. ¶ 71).

On August 3, 2017, Allison Lewis ("Lewis"), Newmark's Chief Administrative Officer, and Lindsey Sherman ("Sherman"), Newmark's Director of Human Resources, advised Capps that Newmark would be conducting an investigation in to Harris's behavior.  (Id. ¶ 63).  On August 17, 2017, Capps followed up with Lewis and Sherman, who advised Capps they had completed the investigation, Capps would hear about it in the coming days, and Newmark would appoint someone internally to oversee and mediate dissolution of the CTG Partnership.  (Id. ¶ 64).  Capps alleges that Newmark failed to corroborate Capps's version of events, and believing without investigating the defamatory falsehoods of Katz and his co-workers.  (Id. ¶ 65).

On August 21, 2017, Capps spoke with Sherman and Lewis concerning the investigation. (Id. ¶ 66).  Sherman stated Newmark would not pursue Capps's personnel matter any further, but instead stated that there were concerns about Capps's behavior.  (Id.).  Sherman claimed she would send Capps some examples of the behavior he was accused of engaging in, but never did.  (Id.). Additionally, Sherman indicated that Newmark was not terminating Capps, nor did it consider the allegations against Capps to be terminable offenses.  (Id. ¶ 68).  Capps met with Newmark's CEO, Barry Gosin ("Gosin"), on three occasions between late August and late September 2017 to discuss the circumstances regarding Katz, Harris, and the failed Human Resources investigation.  (Id. ¶ 73). Capps also informed Gosin that Katz had been hiding information on the deals that he and CTG members had been pursuing.  (Id.).

On November 15, 2017, Capps met with Katz and a "neutral" appointed by Newmark internally to moderate the commission dispute between Katz and plaintif and facilitate dissolution

of the CTG Partnership. (Id. ¶ 75). Katz maintained that Capps was not entitled to any revenue from deals Capps had not been involved with since August 3, 2017, and stated that he had already made deals with other brokers and CTG team members like Harris, promising them Capps's share of commission revenue. (Id.). Capps maintained Katz had no basis to award his fees to other brokers. (Id.).

Newmark allegedly violated the its own policies which it incorporated in to its contract with Capps when it failed to provide Capps with a forum to resolve his commission disputes with Katz. (Id. ¶ 80). Specifically, Capps was either denied a forum to arbitrate his commission disputes altogether or skewing the arbitration in favor of parties other than Capps. (Id. ¶¶ 77, 79-80). In support of this allegation, Capps further alleges that Newmark 1) denied Capps access to information on transactions from which he was excluded, which deprived him of the notice he would need to challenge the commission splits, 2) denied Capps a chance to arbitrate a dispute over one client in March 2018, 3) allowed other CTG members to initiate arbitrations against Capps, 4) refused to disqualify a partial and biased arbitrator, 5) and forbade counsel to be present at an arbitration. (Id. ¶¶ 81-85).

Katz initially filed the instant lawsuit against Capps in Georgia. (Id. ¶ 78). On March 22, 2018, the district court granted Capps's motion to transfer that case to this court, and denied Katz's attempt to transfer the case to federal district court in Florida. (Id. ¶ 88). Less than 30 minutes after the decision's publication, Newmark contacted Capps advising him that it was urgent to speak that day. (Id. ¶ 89). Upon calling Newmark back, Human Resources advised that Capps's employment with Newmark had been immediately terminated "with cause." (Id. ¶ 91). Under the 2015 Broker Agreement, written notice of the cause must be provided, and Capps must be permitted to 30 days

to cure the alleged inappropriate behavior, to the extent curable. (Id.; 2015 Broker Agreement (DE 25-1) ¶ 3). According to Capps, "not only did the alleged behavior not happen, but it had been addressed with Human Resources long ago and and had never been repeated." (Compl. ¶ 91). Capps alleges that Newmark intentionally fabricated a for "cause" termination in order to inflict harm on Capps, including triggering repayment of the Note and halting vesting of Capps's partnership units. (Id. ¶ 92).

Additional facts pertinent to the instant motion will be described below.

## COURT'S DISCUSSION

### A. Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

### B. Analysis

In proceeding with its analysis of Capps's claims, the court first considers claims arising in contract. The court then reviews causes of action in tort.

1.      Contract Claims

        a.      Breach of Contract by Newmark Southern Region

Capps alleges that Newmark Southern Region breached its 2015 Broker Agreement with him because it 1) withheld commissions due to him on all deals sourced by his team, 2) deprived him of the opportunity to fairly arbitrate his claims, and 3) improperly terminated him "with cause." (Compl. ¶¶ 100-01).

"To state a claim in federal court for breach of contract under New York law,[5] a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). "While the meaning of a contract is ordinarily a question of law, when a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc., 66 N.Y.2d 878, 880 (1985).

Turning first to withheld commissions, the facts as alleged state a claim. The language of the 2015 Broker Agreement suggests Newmark Southern Region did not have a right to withhold commissions earned by Capps. (See DE 25-1 at Schedule 1 ¶ 1). The contract provides a formula for how commissions are to be calculated for Transactions and Pending Transactions. (Id. Schedule

---

[5]North Carolina law presumes choice of law clauses to be valid. Perkins v. CCH Computax, Inc., 333 N.C. 140, 141, 146 (1992) (citing Johnston Cty. v. R.N. Rouse & Co., 331 N.C. 88 (1992)). The 2015 Broker Agreement provides that the contract between Capps and Newmark Southern Region is to be construed according to New York law. (DE 25-1 ¶ 14(e)). NRE and Newmark Southern Region also cite upon New York law in their briefs. Therefore, the court applies New York law to determine if Newmark Southern Region breached its contract.

1 ¶ 1).[6]  Then, in pertinent part, the contract provides Capps "shall only <u>be entitled to receive</u>, and will only have earned and be <u>deemed to have earned</u>, Commission compensation for Transactions and Pending Transactions if the relevant commissions are collected by the Company for the applicable Transaction or Pending Transaction." (<u>Id.</u> Schedule 1 ¶ 4) (emphasis added).  In light of the emphasized text, Capps is entitled to receive commissions on Transactions or Pending Transactions where commissions are collected by the Company for that transaction.  And there is no suggestion that the Company has a right to withhold commissions earned by Capps.

Other provisions of the contract regarding external dispute resolution also suggest that at all times Capps remains entitled to commissions closed and paid to the Company.  For example, although the Company has the ability to negotiate a lower commission in the event of a fee controversy with a third party, "Service Provider shall not waive his/her rights to his/her applicable share of any commissions actually received by the Company after exercise of its rights."[7]  (<u>Id.</u> Schedule 1 ¶ 5).  Similarly, where a client of the Company sues over a commission and Capps is part of the controversy, the contract contemplates Capps would have already received his commission:

> If any commission referred to under the Agreement becomes the subject of a dispute, claim or suit during or after the Term of Agreement, and if the Company or any Affiliate has paid Service Provider's portion of the commission or any part thereof, and thereafter, the Company or any Affiliate is required to pay a third party all or a portion of the amounts received by the Company or any Affiliate from such third party pursuant to a court of competent jurisdiction's order ... Service Provider shall within ten (10) days of written notice from the Company or any Affiliate return to the Company or any Affiliate the amounts set forth in such notice....

[6]The contract defines "Transactions" as matters that Capps worked on, distinguishing them from "Pending Transactions," which are transactions not yet completed as of the date of termination of Capps's contract with Newmark Southern Region.  (2015 Broker Agreement (DE 25-1) Schedule 1 at 1, ¶ 8).

[7]The 2015 Broker Agreement defines TMC General Brokerage, LLC as "Service Provider."  (DE 25-1 at 2).  The court infers that Capps is the owner of the LLC, and as such he would be entitled to commissions received by that LLC.

13

(Id. Schedule 1 ¶ 6).  Read together, these provisions contemplate that Capps is entitled to receive commissions on the deals where Newmark Southern Region or its affiliates received payment from clients, and that Newmark Southern Region withholding payment is a breach of contract. [But, does the contract provide for a date when such commissions are to be paid?]

In support of its position that it is entitled to withhold commissions, Newmark Southern Region points to one provision of the contract which states "the Company is permitted to refrain from paying [Capps] any commissions for Pending Transactions that are then in dispute unless and such dispute is resolved, and in such instance, such payment shall be subject to and in accordance with the terms of such resolution."  (Id. Schedule 1 ¶ 10).  If such provision was applicable to the instant case, then no breach occurred by Newmark Southern Region withholding commissions because Capps places the commissions he is entitled to receive in dispute.   (See Compl. ¶¶ 4, 35, 40, 47, 70-72, 75, 79, 81, 86).

However, such provision either is not applicable to the instant case or, at best, it presents an ambiguity in the contract.  The relevant portion of 2015 Broker Agreement is part of a series of provisions detailing how disputes between Newmark Southern Region and Capps would be resolved with regard to outstanding deals "as of the Termination Date," which is defined as "the date that Service Provider permanently ceases to provide services to the Company...other than for purposes of completing Pending Transactions on the Pending List."  (2015 Broker Agreement (DE 25-1) ¶ 1, Schedule 1 ¶¶ 8-10).  Those provisions do not apply to all disputes, which is made clear by the absence of the term "Transactions" from the clause on which Newmark Southern Region relies.  (Id. Schedule 1 ¶ 10).  The provision relied upon by Newmark Southern Region does not involve Transactions as defined in the agreement, which includes transactions closed and paid before

Capps's termination.  (Compare id.  Schedule 1 ¶ 1, 4 with id. Schedule 1 ¶ 10).  Even if this provision creates an ambiguity, then drawing all reasonable inferences in favor of plaintiff, Capps states a claim by alleging Newmark Southern Region breached its contract with plaintiff by withholding disputed commissions.[8]

Similarly, Newmark Southern Region's argument that the 2015 Broker Agreement does not require Newmark to determine the percentage split of broker commission does not defeat Capps's allegations at this stage in the case.  Capps alleges he was entitled to commissions, and Newmark Southern Region withheld those commissions.  (See, e.g., Compl. ¶ 100).  Newmark Southern Region may further develop the record as to computation of those commissions.

Turning next to Capps's claim that Newmark Southern Region breached the contract by denying him a chance to arbitrate his disputes under Newmark's dispute resolution policy, Capps states a claim.  Capps's contract incorporates by reference a Dispute Resolution Agreement, which Capps agreed to sign and abide by.  (2015 Broker Agreement (DE 25-1) ¶ 2).[9]  Capps alleges that the internal dispute resolution procedure in such Dispute Resolution Agreement required notice in order to contest commissions, and that Newmark Southern Region denied him access to the information necessary to provide the requisite notice he would need to arbitrate his disputes. (Compl. ¶ 81).  Capps further argues that he was denied the opportunity to arbitrate certain claims. (See id. ¶ 83).  This is sufficient to state a claim that Newmark Southern Region breached its own

---

[8]At this juncture, the parties do not address, nor does the court consider, the ambiguity in the contract regarding the mechanics and timing of such payments from Newmark Southern Region after commissions were earned by Capps.

[9]The court does not consider the Dispute Resolution Policy and other supporting documents submitted by Newmark Southern Region because the court is unable at this juncture to establish that the Dispute Resolution Policy and other supporting documents are the ones referenced in Capps's complaint and the 2015 Broker Agreement.

dispute resolution policies.[10]

Newmark Southern Region argues that Capps failed to provide reasonable notice of the claims he wished to arbitrate, thereby providing grounds to reject his request to arbitrate. This argument fails because Capps alleges it was Newmark Southern Region's fault that he could not provide the requisite information for notice in the first place. As to Newmark Southern Region's argument that Capps's remedy is a special proceeding to vacate the arbitration award, Newmark Southern Region fails to address the fact that, at least in some instances, Capps was not allowed to arbitrate in the first place. (Compl. ¶¶ 81-83).

Finally, Capps claims that he was wrongfully terminated provides a basis for a breach of contract claim against Newmark Southern Region. Capp's contract provided that he could be terminated for "Cause," which encompasses the following:

> (a) fraud, embezzlement, theft or any misappropriation of any amount of money or other assets or property of the Company, any Affiliate, or its or their customers or clients; (b) material breach by Service Provider of any of the provisions of this Agreement (which are deemed to include, but are not limited to, any breach of Sections 2, 4-8, and 10 herein, failure to follow any lawful direction of the Chief Executive Officer ("CEO") of the Company or senior management of BOC (so long as such directive is consistent with Service Provider's duties under this Agreement), and failure to maintain any regulatory approvals or licenses necessary to perform Service Provider's duties...

(2015 Broker Agreement (DE 25-1) ¶ 3). The contract further provides that written notice of termination must be given, and that to the extent the offending behavior is curable, Capps must be given 30 days from written notice by the Company to cure the behavior. (Id.).

Here, Capps has alleged that Sherman stated that there were concerns about his behavior, but

---

[10]At this juncture, the court does not reach the question of whether Capps's other allegations of misconduct during arbitration proceedings constitute a breach of contract, where Capps has alleged sufficient deficiencies in the dispute resolution process for his claim to proceed.

that Sherman never provided any examples of the behavior that he was accused of engaging in. (Compl. ¶ 66). Sherman also vaguely stated that "Newmark was not terminating Capps, nor did it consider the allegations against Capps to be terminable offenses." (Id. ¶ 68). Months later, Capps was terminated for "cause" immediately after transfer of a related court case from Georgia to this court, with no further explanation. (Id. ¶ 89). Based on the allegations in the complaint, these statements are insufficient to give Capps notice of the basis for a "cause" termination, making it impossible for Capps to know if his behavior was curable, let alone given him the opportunity to cure his behavior. (2015 Broker Agreement (DE 25-1) ¶ 3). Indeed, the 2015 Broker Agreement provides limited grounds for a with cause termination, and Capps alleges that Newmark Southern Region failed to articulate on what ground he was terminated. (Id.; Compl. ¶ 93). Consequently, Capps states a claim for breach of contract.

Newmark Southern Region argues that because it stated in its termination that Capps's behavior was incurable, and because Capps does not state the nature of the behavior for which he was terminated, the court should dismiss Capps's claim. The court rejects this argument as it reverses the standard of review for a 12(b)(6) motion. Capps alleges that he was not given notice of the behavior or opportunity to cure, that he was terminated 30 minutes after an order requiring change of venue was issued, and that Newmark Southern Region had previously been vague in describing his bad behavior. (Compl. ¶¶ 66-67, 89, 91-93). In light of this and the limited grounds for a with cause termination in the 2015 Broker Agreement, the court draws an inference in favor of plaintiff at this stage in the proceeding that Newmark Southern Region breached the contract.

Newmark Southern Region further argues that Capps admitted his inappropriate behavior had been addressed by Human Resources. Newmark Southern Region misconstrues the complaint.

Capps states "[n]ot only did the alleged behavior cited by Newmark not happen, but it had been addressed with Human Resources long ago and never repeated." (Compl. ¶ 91). Read in context with the rest of the complaint, the court is satisfied the Capps did not admit misconduct. The allegation disputed by Newmark Southern Region can reasonably be read to refer back to Capps's previous discussions with Human Resources, who "addressed" Capps's alleged bad behavior by not providing any specific examples of misconduct and saying that the allegations against Capps were not considered terminable. (Id. ¶¶ 66, 68). Therefore rejects Newmark Southern Region's argument that Capps admitted misconduct.

For the reasons stated above, the court denies Newmark Southern Region's motion to dismiss Capps's breach of contract claim.

　　　　　b.　　　Breach of the Covenant of Good Faith and Fair Dealing

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" Id. (internal quotations omitted). However, a claim for breach of the covenant of good faith and fair dealing "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." See Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012); TAG 380, LLC v. ComMet 380, Inc., 10 N.Y.3d 507, 512 n.3 (2008).

Here, Capps alleges the same facts to support his good faith claim as in his breach of contract claim, relying on the same alleged misconduct of Newmark Southern Region. (Compl. ¶ 155). Specifically, he alleges that he did not receive brokerage commissions that are due to him, and he

was unable to monetize the value of CTG. (Id.). Each of these alleged injuries, if proven, stem from the alleged breaches of contract described herein. Therefore, Capps's claim under the covenant of good faith and fair dealing must be dismissed as duplicative.

Capps argues that he is entitled to plead this cause of action as an alternative pleading to breach of contract, citing Federal Rule of Civil Procedure 8(e)(2). However, the rules are silent as to the availability of particular causes of action. The covenant of good faith and fair dealing is a substantive contractual right, and therefore the ability to plead it is governed by New York law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 79–80 (1938). Therefore, Capps's argument fails.

Capps's claims against Newmark Southern Region for violation of the covenant of good faith and fair dealing is dismissed without prejudice for failure to state a claim.

### c. Contract Claims Against NRE

Capps seeks to raise his breach of contract and covenant of good faith and fair dealing claims against NRE as well.[11]

Generally, a party alleging a breach of contract must "demonstrate the existence of a ... contract reflecting the terms and conditions of their ... purported agreement." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 181–82 (2011). A person "is not bound by the provisions of a contract to which it is not a party...." Eaves Brooks Costume Co. v. Y.B.H. Realty Corp., 76 N.Y.2d 220, 227 (1990). Moreover, separate and distinct companies "are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both." See Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc., 2 F.3d 24, 26 (2d Cir. 1993); see also Minister,

---

[11]For the reasons stated above, a breach of the covenant of good faith and fair dealing claim would also be dismissed against NRE if a contract claim were allowed to proceed. However, the court writes separately to discuss the general applicability of Capps's contract claims to NRE.

Elders & Deacons of the Reformed Protestant Dutch Church of City of New York v. 198 Broadway, Inc., 59 N.Y.2d 170, 175–76 (1983). An affiliate corporation will only be held liable for the contractual claims of another where "the [signatory] corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences." TNS Holdings, Inc. v. MKI Sec. Corp., 92 N.Y.2d 335, 339 (1998).

Capps's employment agreement is with Newmark Southern Region. (2015 Broker Agreement (DE 25-1) at 1). The contract does not state that NRE is a party to the contract. (Id.). Only statement that can be construed as mentioning NRE is the portion of the preamble when mentions Newmark Southern Region is affiliated with other entities. (Id.). This is insufficient to establish NRE is a party to Capps's contract with Newmark Southern Region.

Capps alleges that NRE is "engaged in a joint venture, partnership, and common enterprise," and that the companies share several of the same administrative officers. (Compl. ¶¶ 16, 73, 75). However, the allegations raised are insufficient to show that NRE is the alter ego of Newmark Southern Region and thus liable for its contractual obligations. Therefore, Capps's claims for breach of contract and for the covenant of good faith and fair dealing against NRE are dismissed without prejudice.

2.     Tort Claims Against Newmark

"For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." Boudreau v. Baughman, 322 N.C. 331, 335 (1988). Here, Capps resides in North Carolina, all parties transact business in the State of North Carolina, and Capps headed Newmark's Carolina operations from Raleigh. (See Compl. ¶¶ 11, 19, 24). Therefore, the law of North Carolina controls Capps's tort claims.

a.      Aiding and Abetting a Breach of Fiduciary Duty

Capps claims that Newmark aided and abetted Katz's violation of his fiduciary duties owed to Capps.  (Id. ¶¶ 126-30).

The North Carolina Supreme Court has previously adopted concert of action and aiding and abetting liability in certain situations.  See Boykin v. Bennett, 253 N.C. 725, 731 (1961).  In Boykin, the court adopted Section 876 of the Second Restatement of Torts, which recognized concert of action and aiding and abetting liability in a wrongful death action with respect to automobile racing. See id.; Lee v. Certainteed Corp., 123 F. Supp. 3d 780, 797 (E.D.N.C. 2015).  To date, the North Carolina Supreme Court has not addressed aiding and abetting liability with respect to breach of a fiduciary duty.

"Except as specifically adopted in [North Carolina] the Restatement should not be viewed as determinative of North Carolina law."  Hedrick v. Rains, 344 N.C. 729, 729 (1996).  Moreover, Federal courts are to tread carefully when asked to extend state tort law to new scenarios. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir.1998).  As the court discussed in Lee, the North Carolina Court of Appeals has recently been reluctant to extend the scope of liability under Section 876.     Lee, 123 F. Supp. 3d at 798-99.  In Bottom v. Bailey, the North Carolina Court of Appeals court stated that its only prior case recognizing an aiding an abetting a breach of fiduciary duty claim was "no longer valid precedent."  238 N.C. App. 202, 211 (2014).  This, combined with the fact that the North Carolina Supreme Court has not recognized such a cause of action, shows that the North Carolina Supreme Court likely would not recognize such a cause of action.

Capps argues that the court should follow the rationale of In re American Ambulette &

Ambulance Service, Inc., which recognized a cause of action for aiding and abetting a breach of fidcuiary duty under North Carolina law. 560 B.R. 256, 265-66 (Bankr. E.D.N.C. 2016). Capps's reliance on this case is misplaced. None of the cases cited by the bankruptcy court in American Ambulette persuasively explain the case for recognizing an aiding and abetting cause of action, in light of the clear statement by the North Carolina Court of Appeals that it has not affirmatively declared such a cause of action to exist. Bottom, 238 N.C. App. at 212 (declining to decide whether an aiding and abetting a breach of fiduciary duty claim exists at law in North Carolina). To the extent that the bankruptcy court relied upon dicta in Lee to reach its decision, this court reemphasizes the analysis in that case regarding limiting the application of aiding and abetting liability in new scenarios. See Lee, 123 F. Supp. 3d at 798-99. Therefore, the court does not find the bankruptcy court's analysis persuasive as to whether the North Carolina Supreme Court would recognize such a cause of action.

Capps's aiding and abetting a breach of fiduciary duty claim is dismissed with prejudice for failure to state a claim.

> b. Tortious Interference With Prospective Business Relationships

Capps asserts that Newmark interfered with Capps's business relationships by preventing him from "leveraging CTG's success into a new arrangement with Newmark or a competitor beginning in 2019," and "interfer[ing] with his business relationships on major pending deals with clients." (Compl. ¶¶ 132, 134).

"[T]o interfere with a man's business, trade or occupation by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues ...." Spartan Equip. Co. v. Air Placement

Equip. Co., 263 N.C. 549, 559 (1965). Two essential elements of a tortious interference with prospective business relationships claim are the "intervenor's inducement of a third party and a showing that a contract would have ensued." Dalton v. Camp, 353 N.C. 647, 655 (2001). "[A] plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 368 N.C. 693, 701 (2016).

Here, the complaint fails to allege sufficient facts to support Capps's claim. Turning first to Newmark's alleged interference with Capps's Resignation Option, Capps cannot claim tortious interference because Newmark Southern Region would not be a third party to a renegotiated contract. In addition, Capps does not allege that a contract with Newmark or some other brokerage firm would have resulted from the exercise of the Resignation Option but for Newmark's interference. The complaint makes clear that business was going well, and that "Capps and Katz could now envision what awaited in January 2019: exercising the Resignation Option in their respective broker agreements in order to monetize the enterprise value of CTG...." (Compl. ¶¶ 32, 39). However, Capps's unilateral expectancy that he would profit from using his Resignation Option is insufficient to show "a contract would have resulted but for [Newmark's] malicious intervention." Beverage Sys. of the Carolinas, 368 N.C. at 701.

For similar reasons, Capps fails to state a claim as to business relationships with CTG's prospective clients. Without alleging specific lost contracts that Capps alleges he was deprived of by Newmark's conduct, Capps does not establish tortious interference. See id. ([P]laintiff appears to rely on the expectation that [] former customers would continue to do business with plaintiff, an expectation insufficient to support a claim for either tortious interference with contract or tortious

interference with prospective economic advantage.").

Capps invites the court to draw a "reasonable inference" that Newmark "encouraged and induced" prospective employers "to devalue [his] business and not enter any business arrangement." (DE 36 at 22). The court declines this invitation, because the facts as alleged do not support such an inference. See Nemet Chevrolet, 591 F.3d at 255. Capps also argues that Newmark would have had motivation to interfere with Capps's business relationships. This argument is insufficient to establish the elements of the claim asserted by Capps, which requires a showing that contracts with plaintiff's prospective business contacts were going to result before Newmark interfered. Dalton, 353 N.C. at 655.

Capps's claim for tortious interference with prospective business relationships is dismissed without prejudice for failure to state a claim.

c.      Tortious Interference With Contractual Relations

Capps claims that he, Katz, and Harris had an ongoing and enforceable contractual relationship in the CTG partnership, and that Newmark induced Katz and Harris to breach their obligations to Capps. (Compl. ¶¶ 141, 143).

To establish a claim for tortious interference with contractual relations, plaintiff must prove:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

Krawiec v. Manly, 370 N.C. 602, 606–07 (2018) (citations omitted). To show intentional inducement, plaintiff must show that defendants "purposefully caused" a third party to breach its contract. White v. Cross Sales & Eng'g Co., 177 N.C. App. 765, 769 (2006). "Dissolution occurs

automatically by operation of law upon any partner's unequivocal expression of an intent and desire to dissolve the partnership."[12] Sturm v. Goss, 90 N.C. App. 326, 332 (1988); see also Campbell v. Miller, 274 N.C. 143, 150 (1968) (discussing the circumstances under which a dissolution constitutes a breach of contract).

The court finds a reasonable inference exists that Newmark knew of the partnership agreement between Capps, Katz, and Harris, given Newmark's oversight of CTG. (See, e.g., Compl. ¶¶ 64, 162). However, Capps has failed to allege sufficient facts to show that Newmark intentionally induced Katz or Harris to dissolve the CTG Partnership. Indeed, Capps alleges that Katz had begun scheming "with Harris and others, to defame, disparage, and alienate Capps so that Katz could steal from Capps the benefit of the CTG Partnership and the team that they had built together" long before Newmark got involved in the dispute. (See id. ¶ 39-48). According to Capps, "[o]n August 3, 2017, Katz told Capps that he intended to dissolve the CTG Partnership." (Id. ¶¶ 60, 70). It was not until that same day that Sherman and Lewis even contacted Capps to inform him that they were beginning an inquiry in to Harris's behavior. (Id. ¶ 63). This allegation, standing alone, is insufficient to demonstrate intentional inducement, and all the subsequent allegations of misconduct by Newmark came after Katz had already repudiated the CTG partnership agreement. (See, e.g., id. ¶¶ 64, 66).

Capps alleges that he, Katz, and Harris had a partnership agreement which governed the allocation of commissions and passive income. (Id. ¶¶ 34-38). The dispute between Katz, Harris and Capps over commissions and whether a breach of contract occurred turns on the effect of Katz's announcement of his intent to dissolve the CTG partnership. (See id. ¶¶ 60, 70, 75). Since Katz had

---

[12]The court assumes for purposes of this motion only that the CTG Partnership was a legally binding partnership agreement which could be breached. Although it is conceivable that the CTG Partnership might have provided for other methods of dissolution, Capps does not allege a different manner of dissolution agreed upon by the parties than that provided by law. Therefore, the court applies the law on the facts alleged.

already made that decision before Newmark became engaged in the dispute, Newmark cannot be found on the facts alleged to have intentionally induced the breach of Capps's partnership agreement with Katz and Harris.

Capps's claim against Newmark for intentional interference with contractual relations is dismissed without prejudice for failure to state a claim.

        d.     Defamation

Capps claims "[t]hrough written and oral advertisements, Defendants published false and defamatory statements to numerous third parties intended to injure Capps in his trade or profession." (Compl. ¶ 146).

Under North Carolina law, "[t]he declaration or complaint ought to state the [defamation] in the original language." <u>Scott v. Statesville Plywood & Veneer Co.</u>, 240 N.C. 73, 75 (1954); <u>Pierce v. Atl. Grp., Inc.</u>, 219 N.C. App. 19, 33, 724 S.E.2d 568, 578 (2012) ("[T]he words attributed to defendant [must] be alleged 'substantially' <u>in haec verba</u>, or with sufficient particularity to enable the court to determine whether the statement was defamatory."). "There is no basis for an action for [defamation] unless there is a publication of the defamatory matter to a person or persons other than the defamed person." <u>Arnold v. Sharpe</u>, 296 N.C. 533, 539 (1979).

"Generally, one who employs an independent contractor is not liable for the independent contractor's [torts]...." <u>Woodson v. Rowland</u>, 329 N.C. 330, 350 (1991). A limited exception applies where the independent contractor engages in an "inherently dangerous activity." <u>Id.</u> at 352.

The statements alleged by Capps to be defamatory fail to meet the legal requirements for defamation. The statements allegedly made by Sherman and Lewis that Capps engaged in "bad behavior" do not demonstrate publication to third parties. (<u>See</u> Compl. ¶¶ 66, 77). Moreover, vague

statements that Capps engaged in "bad behavior" or that there were "concerns about Capps'[s] behavior" are insufficient to establish that those statements were defamatory. (Id.); see Scott, 240 N.C. at 75.

As to Katz's statement that Capps "was an impediment to the CTG Partnership's success," (Compl. ¶ 42), liability for that statement and others made by Katz does not extend to Newmark under the facts alleged. The complaint alleges that Katz is an independent contractor. (Id. ¶ 25). Moreover, there are no facts which show Katz was engaging in an inherently dangerous activity. Therefore, Newmark would not be liable for defamatory statements made by Katz, who is an independent contractor.

Capps argues that the statements above are sufficient to state a defamation claim. For the reasons discussed herein, the court rejects Capps's argument. Capps's defamation claim is dismissed against Newmark without prejudice for failure to state a claim.

e.    Conspiracy

Capps alleges that Newmark conspired with Katz, "defamed, denigrated, and alienated Capps from the CTG team, and breached or aided and abetted the breach of the duty of loyalty to Capps." (Compl. ¶ 151).

"[A] complaint sufficiently states a claim for civil conspiracy when it alleges "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." Krawiec, 370 N.C. at 614 (quoting State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444 (2008)). "In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts." Shope v. Boyer, 268 N.C. 401, 405 (1966); Reid v. Holden, 242 N.C. 408, 414-15 (1955). "A breach of a contract, nothing

else appearing, does not give rise to an action in tort." <u>Firemen's Mut. Ins. Co. v. High Point</u> <u>Sprinkler Co.</u>, 266 N.C. 134, 141 (1966).

Because all of Capps's tort claims have been dismissed, Capps's claim for civil conspiracy also fails. As discussed above, Capps states a claim for breach of contract by Newmark Southern Region. However, a breach of contract is insufficient to establish Newmark Southern Region engaged in wrongful overt acts. <u>See Reid</u>, 242 N.C. at 414-15; <u>Fireman's Mut. Ins. Co.</u>, 266 N.C. at 141. Since the facts of the complaint to do not support an action in tort, Capps's claim for conspiracy is dismissed without prejudice.

       f.     Unfair and Deceptive Trade Practices

Capps's final cause of action alleges violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").

In North Carolina, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). "In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." <u>Dalton</u>, 353 N.C. at 656. The term "commerce" is defined in the UDTPA as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b).

"Although this statutory definition of commerce is expansive, the Act is not intended to apply to all wrongs in a business setting. For instance, it does not cover employer-employee relations." <u>HAJMM Co. v. House of Raeford Farms, Inc.</u>, 328 N.C. 578, 593 (1991). <u>But see Sara</u>

Lee Corp. v. Carter, 351 N.C. 27, 34 (1999) (finding employee status would not protect a defendant where defendant also engaged the company in a buyer-seller relationship). The UDTPA "is not focused on the internal conduct of individuals within a single market participant, that is, within a single business." White v. Thompson, 364 N.C. 47, 53 (2010).

Capps's claims of unfair and deceptive acts are not in commerce within the meaning of the UDTPA because the facts alleged in the complaint demonstrate the controversy in this case to be an employment dispute internal to Newmark.

Capps and Katz "joined Newmark as partners with the intention of building a novel type of brokerage business." (Compl. ¶ 22). Newmark held out Capps, Katz, and CTG generally as a "team" or "division" of the company both publicly and internally. (Id. ¶¶ 23-24, 28). Capps held a "resignation option" as part of his contract with Newmark, and was also compensated with partnership units in Newmark (Id. ¶¶ 25, 92). The complaint describes CTG as generating revenue "within and for Newmark," and building "credibility internally within Newmark" (E.g., id. ¶ 32, 33). Additionally, Capps admits that he was invited to a "Newmark top producers meeting," which he describes as "a reward for having placed among the top brokers in the entire company in terms of production." (Id. ¶ 42).

Even Capps's allegations about Newmark's alleged wrongdoing reveal the nature of the business. Capps worked through Newmark Human Resources to try to resolve the issues with Harris, and Newmark Human Resources conducted the investigation. (Id. ¶¶ 59-68). Capps met with Gosin, the CEO of Newmark, to discuss the problems that Capps was having with Katz. (Id. ¶ 73). Newmark even appointed a neutral to oversee the dissolution of the partnership between Capps and Katz. (Id. ¶ 75). These allegations all illustrate that the alleged wrongdoing in the

complaint was internal to Newmark, that CTG was a line of business within Newmark, and that Capps, Katz, and Harris are agents of Newmark. Consequently, Newmark's alleged acts are not in commerce within the meaning of UDTPA.

Capps argues that CTG was an independent business because he and Katz signed agreements with Newmark Southern Region as independent contractors. (Id. ¶¶ 20, 25). Capps's argument is unpersuasive. Regardless of how Capps and Katz chose to designate themselves in their employment contracts with Newmark Southern Region, the complaint makes clear over and over again that CTG operated within, and relied on the resources of, Newmark when conducting its business. (E.g., id. ¶ 28, 162). Capps makes equally clear that although he was designated as an independent contractor, he was also a partner in Newmark. (Id. ¶ 22). Ultimately, the issue is not whether Capps is designated an "employee" or "independent contractor," but rather whether the actions taken by Newmark are "in or affecting commerce." See Dalton, 353 N.C. at 656; Bunting v. Perdue, Inc., 611 F. Supp. 682, 690 (E.D.N.C. 1985). Capps has failed to allege facts sufficient to make this showing.

Capps's UDTPA claim is dismissed without prejudice for failure to state a claim.


**CONCLUSION**

Based on the foregoing, Newmark Southern Region's and NRE's motion to dismiss (DE 25) is GRANTED IN PART and DENIED IN PART as set forth herein.[13]

The following claims are dismissed without prejudice for failure to state a claim:

1)      Breach of Contract by NRE;

2)      Tortious Interference with Prospective Business Relationships;

---

[13]Except as specified, the court dismisses claims against Newmark Southern and NRE.

3)      Tortious Interference with Contractual Relations;

4)      Defamation;

5)      Conspiracy;

6)      Breach of the Implied Covenant of Good Faith and Fair Dealing;

7)      Unfair and Deceptive Trade Practices, in violation of N.C. Gen. Stat. § 75-1.1.

The following claim is dismissed with prejudice for failure to state a claim:

1)      Aiding and Abetting Breach of Fiduciary Duty.

The following claim is not dismissed:

1)      Breach of Contract by Newmark Southern Region.

        Where no claims remain against Newmark & Company Real Estate, Inc., the court hereby

DISMISSES Newmark & Company Real Estate, Inc. from the case.

        SO ORDERED, this the 26th day of November, 2018.


                                        _____
                                        LOUISE W. FLANAGAN
                                        United States District Judge