IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-133-FL

| TIMOTHY CAPPS, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| NEWMARK SOUTHERN REGION, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to exclude the expert testimony of David Gulley, pursuant to Rule 702 of the Federal Rules of Evidence and related authority. (DE 160). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendant's motion is granted.

## BACKGROUND

A. Procedural History

This case has a lengthy and contentious procedural history. In the interest of judicial economy, the court summarizes only the information pertinent to the instant motion.

The facts as alleged by plaintiff may be summarized as follows. Plaintiff is a real estate broker who formerly worked for defendant representing commercial tenants. Defendant is a limited liability company providing brokerage services to its clients. Plaintiff and his colleague, Gregory Katz ("Katz"), were hired by defendant in January 2015. While working for defendant, plaintiff and Katz led the Critical Transactions Group ("CTG") as partners. CTG was a

collaborative team of brokers provided resources by Katz and plaintiff to pursue and close large commercial real estate transactions. In all cases, CTG's compensation structure remained consistent: Capps and Katz each received around 30% of the commissions, while the CTG junior brokers and others CTG members received smaller, but consistent shares. Eventually, CTG became so successful that Katz decided to box plaintiff out of the group, denying plaintiff commissions earned and ultimately the sale of CTG to another enterprise. On August 3, 2017, Katz announced his intention to dissolve his partnership with plaintiff. Shortly thereafter, at Katz's behest, defendant commenced investigation in plaintiff's behavior, which was ultimately closed. Several months later, and contemporaneous with litigation between plaintiff and Katz, defendant terminated plaintiff "with cause," a specific designation under the parties' agreement for services with specific contractual requirements. Plaintiff contends that his termination "with cause" was a breach of contract.

On March 29, 2018, plaintiff initiated the instant lawsuit against defendant,[1] asserting numerous causes of action. Several months later, on November 26, 2018, the court dismissed all of plaintiff's claims against defendant except breach of contract.[2] Thereafter, defendant counterclaimed against plaintiff for breach of a promissory note. Following the court's dismissal order, discovery continued for several months. On March 1, 2019, plaintiff served the report of David Gulley, plaintiff's proffered expert on damages incurred by defendant. Gulley was deposed on May 29, 2019.

On June 6, 2019, pursuant to plaintiff's contractual agreement with defendant, the court compelled arbitration of plaintiff's commission disputes against Katz, Harris, and defendant. On

---

[1] Plaintiff also asserted claims against Newmark & Company Real Estate, Inc., Katz, and Monty Harris ("Harris"), another CTG broker.

[2] The court also dismissed all claims against Newmark & Company Real Estate.

2

collaborative team of brokers provided resources by Katz and plaintiff to pursue and close large commercial real estate transactions. In all cases, CTG's compensation structure remained consistent: Capps and Katz each received around 30% of the commissions, while the CTG junior brokers and others CTG members received smaller, but consistent shares. Eventually, CTG became so successful that Katz decided to box plaintiff out of the group, denying plaintiff commissions earned and ultimately the sale of CTG to another enterprise. On August 3, 2017, Katz announced his intention to dissolve his partnership with plaintiff. Shortly thereafter, at Katz's behest, defendant commenced investigation in plaintiff's behavior, which was ultimately closed. Several months later, and contemporaneous with litigation between plaintiff and Katz, defendant terminated plaintiff "with cause," a specific designation under the parties' agreement for services with specific contractual requirements. Plaintiff contends that his termination "with cause" was a breach of contract.

On March 29, 2018, plaintiff initiated the instant lawsuit against defendant,[1] asserting numerous causes of action. Several months later, on November 26, 2018, the court dismissed all of plaintiff's claims against defendant except breach of contract.[2] Thereafter, defendant counterclaimed against plaintiff for breach of a promissory note. Following the court's dismissal order, discovery continued for several months. On March 1, 2019, plaintiff served the report of David Gulley, plaintiff's proffered expert on damages incurred by defendant. Gulley was deposed on May 29, 2019.

On June 6, 2019, pursuant to plaintiff's contractual agreement with defendant, the court compelled arbitration of plaintiff's commission disputes against Katz, Harris, and defendant. On

---

[1] Plaintiff also asserted claims against Newmark & Company Real Estate, Inc., Katz, and Monty Harris ("Harris"), another CTG broker.

[2] The court also dismissed all claims against Newmark & Company Real Estate.

2

September 12, 2019, the court granted the motion of plaintiff, Katz, Harris, and Kacie Van Hine ("Van Hine"),[3] to voluntarily dismiss all claims between them with prejudice, leaving only plaintiff's breach of contract claim against defendant and defendant's counterclaim against plaintiff for breach of a promissory note. After two successive rule 16 conferences, plaintiff filed motion to amend his complaint. On May 1, 2020, the court granted in part and denied in part plaintiff's motion to amend, reinstating plaintiff's claim for breach of the covenant of good faith and fair dealing but finding plaintiff's tortious interference with business relationships claim futile.

Defendant also filed the instant motion to exclude Gulley's testimony, relying upon Gulley's deposition testimony and voluminous exhibits. (See Paul Decl. (DE 162, 163, 164, 165) ¶¶ 6–25). Bench trial of this matter is scheduled to commence September 28, 2020.[4]

B.   Proffered Opinions

Gulley is a member of the faculty at Columbia University's school of business. (Gulley Report (DE 162-2) at 9, 12). He is an economist by training, with scholarly research and instructional experience covering a range of topics, including statistics and operations research, business economics; finance; and valuation. (Id. at 10, 11–12). He has testified as an expert in federal court as early as 1984, providing valuations of damages in bankruptcy, employment contract, intellectual property, securities, and general commercial disputes. (Id. at 12–13).

Gulley opines that plaintiff's lost earnings and other compensation amount ranges from $9,972,293.04 to $15,194,524.25. (Id. at 8, 21). Gulley reaches this figure by addressing several different types of compensation. First, Gulley addresses commissions plaintiff claims he is owed. To reach this figure Gulley assumed that, for all deals sourced by CTG team members, plaintiff

---

[3]   Van Hine was plaintiff's executive assistant. Katz sued plaintiff and Van Hine in an action consolidated with the instant case.

[4]   Motion to continue trial filed May 8, 2020, will be addressed by separate order.

was entitled to 33.14% of 60% of NFK commissions through the end of February 2018 and 65% thereafter. (Id. at 5). Based on this assumption, Gulley opines that plaintiff is owed $1,583,495.87 in unpaid commissions for deals closing after August 3, 2017,[5] the day that Katz announced his intent to dissolve the CTG partnership. (Id. at 4, 5). He opines that plaintiff is owed $5,211,797.60 in commissions on deals that closed after plaintiff's termination of employment. (Id. at 5).

Gulley further opines that plaintiff was owed anywhere from $2,320,991.65 to $7,543,222.86 in compensation for spoiled deals that were never consummated by defendant. (Id. at 6). To reach this determination, Gulley reviewed the data in this case and determined that approximately 20% of pending deals that reached a certain milestone had, in fact, closed successfully. (Id.). The deals in issue passed that milestone. (Id.). Supposing that the likelihood of closing the deals was higher than 20%, and supposing that one or more such deals would have continued to be pursued by defendant if the likelihood of success was high, so long as defendant had access to the buyers, Gulley calculated plaintiff's compensation for spoiled deals based on plaintiff's asserted commission rate of 33.14%, broker splits of 60% and 65%, and risk discounts of 25%, 50%, and 75%, resulting in damages anywhere from $2,320,991.65 to $7,543,222.86. (Id.).

Next, Gulley opines that plaintiff is owed several other items of compensation. He opines that plaintiff was entitled to a signing bonus of $525,000.00 associated with renegotiation of his employment contract. (Id.). He opines that plaintiff is owed $539,109.94 in restricted equity units ("REU"). (Id.). Finally, he opines that plaintiff is owed $131,118.99 for infrastructure support costs paid by plaintiff from August 2017 to February 2018, on the theory that these funds were investments in the future success of CTG that will never be recovered. (Id.).

---

[5] Gulley subtracted payments made to plaintiff by defendant for deals closing after August 3, 2017, as an offset of $339,221.01. (Id. at 6).

Finally, Gulley opines that the foregone business value of CTG to plaintiff in sale of the business to a potential third-party acquirer is $2,674,238.59. (Id. at 7). Gulley opines that, as a business services team, a hypothetical buyer would be attracted to CTG's past, present, and prospective customer list; its ability to retain customers and generate additional referrals; and its intellectual assets. (Id.). CTG's cost structure would be less relevant, with historical revenues as the dominant driver in valuing CTG for purposes of acquisition. (Id.). Applying a revenue multiple of 1.3x, Gulley valued CTG at $5,348,477.19. (Id.; see id. at 16–18). Assuming Katz and plaintiff shared in the value of a CTG acquisition generally, Gulley opined plaintiff lost $2,674,238.59 in forgone business value. (Id. at 7).

## COURT'S DISCUSSION

A.      Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.

Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" upon a trial judge to "ensure that any and all scientific testimony is not only relevant, but reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592–93 (1993). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

5

Case 5:18-cv-00133-FL   Document 185   Filed 05/22/20   Page 5 of 14

"[R]elevance – or what has been called 'fit' – is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Ancient Coin Collectors Guild, 899 F.3d 295, 318 (4th Cir. 2018) (quoting Daubert, 509 U.S. at 597). The court must determine whether the expert's "reasoning or methodology properly can be applied to the facts in issue." Cooper, 259 F.3d at 199 (quoting Daubert, 509 U.S. at 592–93). "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir.1993).

The reliability inquiry is a "flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (internal quotations omitted). One factor pertinent to reliability is the proposed expert's qualifications. See Giddings v. Bristol–Myers Squibb Co., 192 F.Supp.2d 421, 425 (D. Md. 2002). A witness may qualify to render expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education. Kumho Tire, 526 U.S. at 147. The United States Court of Appeals for the Fourth Circuit has ruled that when an expert's qualifications are challenged, "'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" Kopf, 993 F.2d at 377 (quoting Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir.1989)).

In assessing whether expert testimony is "reliable," the court considers additional factors besides the expert's qualifications. These include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the

6

techniques' operation; and (5) whether the technique has received general acceptance within the relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (internal quotations omitted). These factors are "neither definitive, nor exhaustive," and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Cooper, 259 F.3d at 199–200. "[T]he court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] ... depend[ing] upon the unique circumstances of the expert testimony involved." Westberry, 178 F.3d at 261.

Of course, the admission of expert testimony must be considered within the context of the other rules of evidence. In particular, Rule 403 provides that the court must ensure that the probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. As this court has noted, "[d]espite the court's ability to exercise broad discretion and flexibility when determining the admissibility of expert testimony, the court must balance this discretion with the concerns of Rule 403 to ensure that the probative value of the proffered testimony is not 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722, 725 (E.D.N.C. 2007) (quoting Fed. R. Evid. 403).

B. Analysis

1. Disputed Commissions

The first two types of lost earnings that Gulley opines on are unpaid commissions for deals closing after August 3, 2017, but while plaintiff remained employed by defendant, and unpaid commissions on "pending" deals closed after plaintiff's termination. Gulley's report on March 1,

7

2019, and his deposition on May 29, 2019, do not reflect important subsequent developments in this case. Pursuant to the court's order on June 6, 2019, arbitration was compelled as to all claims for commissions owed to plaintiff. Prior to completion of arbitral process, plaintiff settled his commission disputes, and defendant subsequently withheld that amount claiming offset of monies owed for breach of promissory note. Where plaintiff's settlement of his commission disputes is a sum certain, the trier of fact does not require expert testimony to ascertain the settled value of the commissions.

Even if not already reduced to sum certain, Gulley's method of valuing plaintiff's alleged lost commissions does not involve application of specialized knowledge to the facts of this case. Cf. Bresler v. Wilmington Tr. Co., 855 F.3d 178, 184, 188, 195–96 (4th Cir. 2017) (admitting expert testimony on damages regarding the net-in-trust shortfall in a complex insurance contract dispute). Gulley's method consists of assuming 33.14% as plaintiff's share of 60% (or 65%) of defendant's commission allocated to CTG and multiplying plaintiff's assumed percentage based on the commissions earned on CTG deals. (Gulley Dep. (DE 162-6) 62:12–63:11, 151:8–16). Gulley rests his assumption upon instruction by plaintiff's counsel to use 33.14% as plaintiff's share of CTG's commission. (Gulley Dep. (DE 162-6) 151:3–7). Such "method" amounts to simple multiplication, with no expert explanation as to why 33.14% is a more appropriate representation of plaintiff's share of commissions than any of the other historic commission splits attributed to plaintiff. (See Gulley Report (DE 162-2) at 20, 22, 23). As Gulley succinctly puts it: "[t]he jury could do it." (Gulley Dep. (DE 162-6) 152:2–5).

Where the trier of fact can readily determine the damages, if any, defendant owes plaintiff in commissions withheld by defendant, Gulley's expert opinion in this part is not relevant. See Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir. 1995) (emphasis in original) ("The

8

Case 5:18-cv-00133-FL   Document 185   Filed 05/22/20   Page 8 of 14

touchstone of whether a witness may testify as an expert under Fed. R. Evid. 702 is . . . whether he would be 'helpful,' but it is helpfulness to the trier of fact, not to a party's case, that counts."); Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986).

2. Spoiled Deals

Next, Gulley opines that defendant is liable to plaintiff for several "spoiled deals." These deals are the subject of plaintiff's reinstated claim for breach of the covenant of good faith and fair dealing.

Gulley's expert opinion regarding the valuation of spoiled deals is comprised of three different inputs: 1) the identity and value of the potentially spoiled deals, 2) the commission plaintiff would be owed if any of these transactions had been consummated, and 3) a discount factor reducing the value of the spoiled deals to the amount attributable to defendant for failure to consummate the deal. As noted above, the commission Gulley computes plaintiff would be owed is not an admissible expert opinion, where simple arithmetic does not depend on specialized knowledge. The identity and value of the potentially spoiled deals is a fact assumed by Gulley, which likewise does not involve any calculation or application of specialized knowledge.[6] (See Gulley Dep. (DE 162-6) 156:18–157:22). Thus, the only analysis done by Gulley that potentially could serve as a relevant expert testimony regarding spoiled deals is calculation of an appropriate discount factor.

Assuming calculation of a discount factor does involve application of specialized knowledge, plaintiff has not shown by a preponderance of proof that Gulley's discount factors are the product of reliable expert analysis. To determine the discount factor, Gulley reviewed

---

[6] The court does not reach the issue of whether Gulley's assumption fits the facts of this case, although defendant presents testimony that none of the deals identified were "spoiled deals." (See Matthews Aff. (DE 165-8) ¶¶ 4– 9; Walsh Aff. (DE 165-9) ¶¶ 5–10).

9

materials prepared in the ordinary course of business for CTG. (See Gulley Dep. (DE 162-6) 167:10–12). From these materials, Gulley determined that, if a broker got a meeting with a qualified party, approximately one out of five prospects would convert to deals. (Gulley Dep. (DE 162-6) 164:14–166:18, 168:24–169:13). Based on this number, and because Gulley "understood that at least some of these deals were further along and further progressed and were surviving," he suggests for the trier of fact discount rates of 25, 50, and 75%. (Gulley Dep. (DE 162-6) 167:16–168:14). When asked by defendant what the correct discount rate for spoiled deals should be, Gulley testified:

> A. . . . So I haven't formed an opinion what is the right discount to take, and it could be 20 percent, it could even be more severe than that. Or it could be a considerably better. I don't think without more evidence around this issue, I can't form a more precise opinion about it.
>
> Q. Did you ask for more evidence?
>
> A. I asked what evidence there was, and this is what I was given.

(Gulley Dep. (DE 162-6) 168:14–23).

Where Gulley admits that he lacks sufficient information to form an opinion as to the appropriate discount rate for spoiled deals, Gulley's expert opinion on the appropriate discount rate for spoiled deals is not reliable. Gulley takes a basic ratio of 20% deal completion for those deals that reached a meeting, and speculates that, because the spoiled deals progressed past the meeting milestone, some discount rate greater than 20% applies. This "method," full of assumption yet devoid of any descriptive calculation or analysis, produced discount rates ranging anywhere from 25–75%. The court's gatekeeper obligation under Daubert precludes it from admitting such speculative testimony as a reliable expert opinion.[7] See Tyger Const. Co. Inc. v.

---

[7] Plaintiff's argument that the court may disregard Rule 702 merely because the case proceeds to bench trial as opposed to jury trial is unpersuasive. The court is still obligated to apply the Federal Rules of Evidence. See, e.g. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

10

Case 5:18-cv-00133-FL   Document 185   Filed 05/22/20   Page 10 of 14

Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994). Accordingly, Gulley's opinion testimony as to the value of spoiled deals must be excluded.

3. Sale of CTG

Another type of lost earnings that Gulley seeks to attribute to defendant is the lost value of the sale of CTG, an alleged closely held business, to a potential third-party acquirer.

"An expert's opinion as to damages must be causally related to the alleged harm." Tyger Const. Co., 29 F.3d at 142; see also SMD Software, Inc. v. EMove, Inc., 945 F. Supp. 2d 628, 642 (E.D.N.C. 2013) (excluding expert testimony calculating damages outside the scope of the cause of action provided under the Lanham Act).

In Gulley's view, the damages calculation in this case "is based on the scenario that the sum total of these bad acts, ruining people's reputation, you know, the interpersonal conflicts that were created, that we roll the clock back to the fact that these things did not happen." (Gulley Dep. (DE 162-6) 48:25–49:20, 89:5–14, 293:13–16). Gulley's opinion does not fit the facts of the case, where it exceeds the liability attributable to defendant for breach of contract. Plaintiff's agreement for services with defendant provides that "During the Term of Agreement, the Company may terminate this Agreement with Service Provider with or without Cause." (Broker Services Agreement (DE 166-2) at 2). It is undisputed that plaintiff was terminated on March 22, 2018, during the term of the agreement. (Id.; Ans. to Compl. (DE 57) ¶¶ 89, 90). The issue in this case is not whether defendant breached its contract with plaintiff by terminating him. Rather, the issue is whether defendant's decision to terminate plaintiff "with cause" instead of "without cause" breached the parties' agreement for services, and what contractual damages flow from this

11

allegedly improper designation. (See Broker Services Agreement (DE 166-2) at 2). The foregone value of CTG is outside the scope of defendant's contractual liability.[8]

Even if valuation of CTG were relevant, Gulley's valuation is unreliable as it rests on speculative assumptions about "the dynamics between [plaintiff] and the rest of [CTG]." (Gulley Dep. (DE 162-6) 84:15–25, 88:9–15, 89:5–14, 89:21–25, 220:14–16). Specifically, Gulley assumes without evidence that Katz and Capps would continue to work together, despite being aware that Katz stated more than seven and a half months prior to plaintiff's with cause termination that he would no longer work with plaintiff. (See Gulley Dep. (DE 162-6) 81:8–9, 205:17–23). Gulley concedes that such unwillingness to work together "probably does decrease the value of the team somewhat," but speculates that "there are plenty of business services teams that are compelled by self-interest to stay together." (Gulley Dep. (DE 162-6) 205:24–206:9). When questioned further on this musing, Gulley could not give a cogent answer why it was reasonable to assume that Katz and plaintiff would continue to work together. (Gulley Dep. (DE 162-6) 358:22–359:9). Gulley's opinion also assumes that CTG's customer lists were an asset relevant to valuation of sale of CTG, despite being made aware that CTG's customer lists were confidential information belonging to defendant, not plaintiff. (See Gulley Dep. (DE 162-6) 216:6–217:20; Gulley Report (DE 162-2) at 16).

Where the record does not demonstrate that Gulley's valuation of CTG is relevant or reliable, his opinion on this issue must be excluded.

4. Other Compensation

---

[8] Under New York law, the elements of breach of contract are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

12

Gulley also opines on three other types of compensation denominated as "other" compensation: 1) plaintiff's lost signing bonus, 2) loss of plaintiff's REUs, and 3) infrastructure support costs for CTG.

As noted above, Gulley initially opined that plaintiff was owed a $525,000.00 signing bonus. Gulley testified that, without any computation or analysis, he assumed plaintiff would receive the same bonus in January 2019. (Gulley Dep. (DE 162-6) 191:2–19). He also testified that "I believe that assumption's actually wrong. And if I were to fully update this report I would probably pick another number." (Gulley Dep. (DE 162-6) 74:21–25). Gulley never provided an updated report. As Gulley's own testimony indicates that his expert opinion regarding plaintiff's signing bonus is neither relevant nor reliable, the court excludes Gulley's opinion in this part.

Next, Gulley opines that plaintiff is owed damages for loss of REUs earned by plaintiff but not exchanged. (Gulley Report (DE 162-2) at 26). To determine the amount of money owed, Gulley reviewed business process data and identified the awards already used and the value, and the date they appeared in in his expert report. (Gulley Dep. (DE 162-6) 192:2–14). Gulley opines that the conservative and most straightforward way to assign REUs value is to apply the value assigned in the business process data. (Gulley Dep. (DE 162-6) 192:15–21). However, Gulley's opinion is not reliable, where Gulley testifies that the cash value of the REUs depends on the grant documents, and he did not review the REU grant documents in formulating his damages estimate for the REUs. (Gulley Dep. (DE 162-6) 192:22–193:6). Moreover, even if the court were to assume Gulley's methodology is reliable, specialized knowledge is not required for the factfinder to look at business process data and identify the stated value of plaintiff's REUs. Thus, Gulley's opinion as to the value of plaintiff's REUs must be excluded.[9]

---

[9] The court does not reach defendant's legal argument that plaintiff may not claim REUs as damages. (See Second Amended and Restated Agreement of Limited Partnership of BGC Holdings, L.P. (DE 163-4) at 29, Amended

13

Finally, Gulley opines that plaintiff is owed compensation for costs paid by plaintiff to support CTG infrastructure from August 2017 to February 2018 as an investment in the success of CTG. (Gulley Dep. (DE 162-6) 195:12–21, 197:6–17). As discussed above, the foregone value of CTG is not relevant to plaintiff's breach of contract claim against defendant. (See Pl. Resp. (DE 168) at 3). In addition, Gulley's assessment of the staff reimbursements plaintiff is owed does not involve any specialized computation or analysis, but instead lists staff reimbursements based on checks made by plaintiff. (See Gulley Report (DE 162-2) at 27–28). Therefore, Gulley's opinion regarding plaintiff's entitlement to staff reimbursements must be excluded.

## CONCLUSION

Based on the foregoing, defendant's motion to exclude the testimony of David Gulley (DE 160) is GRANTED.

SO ORDERED, this the 22nd day of May, 2020.

LOUISE W. FLANAGAN
United States District Judge

---

and Restated Agreement of Limited Partnership of Newmark Holdings, L.P. (DE 164-2) at 112). Ruling on this question of law is reserved for trial.